IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.                                         CASES NO. 4:16cv23-RH/CAS

JOHN E. FIGLEWSKI,
GEORGE J. HALL, and
CHARLES M. SCOTT, JR., et al.

      Defendants.

_____/

## ORDER IMPOSING CIVIL PENALTIES ON DEFENDANTS FIGLEWSKI, HALL, AND SCOTT

The Securities and Exchange Commission seeks civil penalties against three defendants for violations of securities laws. The defendants oppose the requested penalties but admit their alleged violations for purposes of the penalty issue. This order imposes penalties in an appropriate amount.

I

The SEC brought this civil action alleging securities violations by 11 defendants. Each defendant entered a settlement agreement calling for an

injunction and civil penalty. Eight of the agreements specified the amount of the civil penalty. For the other three defendants—John E. Figlewski, George J. Hall, and Charles M. Scott, Jr.—the agreement called for a penalty but left open the amount for determination by the court. The defendants admitted the complaint's factual allegations for purposes of the penalty issue.

Separate judgments have been entered under Federal Rule of Civil Procedure 54(b) resolving all issues except for imposition of a civil penalty against Mr. Figlewski, Mr. Hall, and Mr. Scott.

II

The 167-page complaint includes detailed factual allegations too extensive to recount here. A brief summary is this. Each of the 11 defendants held a position with Superior Bank ("the Bank") or its public holding company, Superior Bancorp ("the Holding Company"), during all or part of the period from 2006 to 2011. The defendants engaged in a widespread and egregious pattern of accounting-based fraud. The fraud included materially misstating the financial condition of the Bank and the Holding Company, making false filings with the SEC, and deceiving an individual investor in a private stock sale. Examples of the false reporting included these: the Holding Company's income before income taxes was misstated by $80.2 million or 71% for 2009 and was misstated by $197.9 million or 54% for the first three quarters of 2010.

The misstatements resulted in part from a pattern of extending and failing to write down loans that were not performing and had no reasonable prospect of repayment. This concealed from regulators the value of loans and resulted not from errors of judgment but from a willful effort to forestall appropriate regulatory action. The Bank eventually failed. Another bank purchased the Bank's assets and liabilities at a brokered sale. The Federal Deposit Insurance Corporation incurred a loss of over $320 million.

### III

The federal securities laws authorize civil penalties for violations like these. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). Civil penalties serve to "to punish the individual wrongdoer and to deter him and others from future securities violations." *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014). Because each violation can give rise to a new penalty, "courts are empowered to multiply the statutory penalty by the number of statutes the defendant violated, and many do." *See SEC v. Miller*, 744 F. Supp. 2d 1325, 1345 (N.D. Ga. 2010).

The statutes provide for three "tiers" of penalty, depending on the severity and consequences of the violation. The second tier applies to a violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii). The third tier applies to a violation that met the second tier's fraud requirement and further

"directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* at §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

The maximum authorized penalty increases in each tier. At the time of the defendants' violations, the maximum penalty for a second-tier violation was $75,000, while the third-tier maximum was $150,000. *See* 17 C.F.R. § 201.1001. In this case each defendant committed multiple violations in at least the second tier and probably in the third, but either way the appropriate penalty is well below the cumulative maximum.

The appropriate penalty for any defendant depends on factors that include the egregiousness of the violations, whether the violations were isolated or repeated, other penalties imposed, the defendant's net worth and ability to pay, and whether the defendant is employed in the securities industry. *See SEC v. Sargent*, 329 F.3d 34, 41-42 (1st Cir. 2003); *see also Miller*, 744 F. Supp. 2d at 1344. The defendants emphasize their limited ability to pay, but that is just one relevant factor; "nothing in the securities laws expressly prohibits a court from imposing penalties . . . in excess of a violator's ability to pay." *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

Like sentencing in a criminal case, determining the appropriate civil penalty for any given defendant requires judgment. Mathematical precision is neither feasible nor desirable.

IV

From February 2008 until April 2011, Mr. Figlewski was the Bank's chief credit officer for Florida and chair of the Bank's Florida loan committee. He participated in the fraud, which was extensive, involved numerous transactions, and continued for a long period.

Mr. Figlewski was a banker before, during, and after the fraud—for a total of about 34 years, from roughly age 26 to age 60. As a result of a consent injunction resulting from this same pattern of fraud, he cannot work in banking. He is 61 or perhaps now 62 years old. Since the events at issue, he has divorced. He has been unable to find "meaningful employment" since March 2016 but has taken steps to become a teacher—to provide important public service at a modest income. He says he has used a significant amount of his liquid assets and has used retirement funds to meet living expenses. He places his net worth at just over $300,000.

Mr. Figlewski held a substantial position and participated in egregious violations. He violated or aided and abetted violations of at least nine securities statutes or rules. He was neither the most nor the least senior of those who participated. He has lost his career and substantial income. But at least insofar as shown by this record, he still has assets derived from his time at the Bank—time that was extended by the fraudulent conduct. A substantial penalty is warranted.

This order imposes a civil penalty on Mr. Figlewski in the amount of $100,000.

V

From December 2006 until April 2011, Mr. Hall was the Bank's Florida president and a member of its Florida loan committee. This put him above Mr. Figlewski in the hierarchy. Mr. Hall participated in the fraud.

Mr. Hall is 60 years old. He entered banking in 1983 after four years in the United States Army. He worked in banking before, during, and after the fraud—for a total of about 32 years, from roughly age 26 to age 58. As a result of a consent injunction resulting from this same pattern of fraud, he cannot work in banking.

After entry of the injunction, Mr. Hall signed on with an investment-services company. The undertaking was a disaster, requiring a $350,000 investment that appears lost and requiring Mr. Hall to guarantee a $1.5 million debt that he may be called on to pay. Those developments have taken Mr. Hall from a substantial positive net worth to a negative net worth. But he still has substantial assets, including cash, securities, and an individual retirement account that collectively exceed $800,000. He has physical limitations from an old Army injury and bleak prospects for substantial future employment.

Mr. Hall is married with four children. Three are adults, two with substantial disabilities that require continuing care from Mr. Hall and his wife. Mrs. Hall cares

for the children and does not work outside the home. Mr. Hall belongs to civic organizations and does significant volunteer work.

Mr. Hall held a substantial position and participated in egregious violations. He violated or aided and abetted violations of at least 11 securities statutes or rules. He was among the most senior participants. He has lost his career and substantial income. But he still has assets apparently derived at least in part from his time at the Bank—time that was extended by the fraudulent conduct. A substantial penalty is warranted.

This order imposes a civil penalty on Mr. Hall in the amount of $100,000.

VI

From January 2005 to October 2009, Mr. Scott was the Bank's president, and in October 2009 he became the Bank's chief executive officer. He was a member of the Bank's executive loan committee, Florida loan committee, and Alabama loan committee. In March and April 2011, Mr. Scott was chair and chief executive officer of the Holding Company.

Mr. Scott is 67 years old, or perhaps now 68. His 40-year banking career ended when the Bank failed. He has not sought other traditional employment. He has instead devoted his time and resources to a remarkable undertaking he began roughly 17 years ago.

Mr. Scott is an ordained minister and pastor of a church in Van Buren, Arkansas, a city of 23,000 near the Oklahoma border. Mr. Scott and his wife operate a facility that provides rehabilitation and counseling services to drug addicts and alcoholics. The facility has housed over 1,000 individuals since 2003. The facility receives referrals from judges, prosecutors, and parole authorities.

Mr. and Mrs. Scott receive no meaningful compensation from the facility. Instead, the facility has been funded in the past primarily from Mr. Scott's own contributions. When he was employed, he typically contributed 15% of his earnings to the facility, and he occasionally made lump-sum contributions of more than $100,000. He has continued to make contributions, presumably much smaller, since his employment with the Bank ended.

In about 2005, Mr. and Mrs. Scott gave up their home to provide those receiving treatment a place to live. Since Mr. Scott left banking, he and Mrs. Scott have lived in a one-bedroom apartment while 20 or more individuals receiving treatment have lived in their former residence. When Mr. Scott submitted his affidavit in June 2017, the treatment facility had 30 residents, including 6 children with their mothers, and 17 of the 30 lived in the Scotts' former residence. The residence is dedicated entirely to this undertaking.

Mr. Scott has a substantial negative net worth, would have limited ability to change that if he tried, and apparently does not intend to try. He instead intends to continue with his effort to assist addicts at no financial benefit to himself.

Mr. Scott was apparently the captain of the ship as it went down. He is responsible for egregious violations. He violated or aided and abetted violations of at least 11 securities statutes or rules. He has lost his career and substantial income, but he was near retirement anyway. Were it not for Mr. Scott's extraordinary community service and the depletion of his assets in that endeavor, a substantial penalty would be warranted. But Mr. Scott has provided extraordinary service dating to a time before the fraud. These are not good works of a person seeking a lighter penalty. These are instead, at least as shown by the undisputed evidence in this record, good works of a generous public-spirited individual. The burden of a civil penalty likely would fall more heavily on the addicts Mr. Scott is trying to help than on Mr. Scott himself. Under all the circumstances, and taking into account Mr. Scott's negative net worth and bleak prospects for gainful employment, the appropriate civil penalty is zero.

VII

For these reasons,

IT IS ORDERED:

1. A civil penalty is assessed against the defendant John E. Figlewski in the amount of $100,000.

2. A civil penalty is assessed against the defendant George J. Hall in the amount of $100,000.

3. No civil penalty is assessed against the defendant Charles M. Scott, Jr.

4. The clerk must enter this order as the final judgment disposing of all remaining issues among all parties.

5. The court reserves jurisdiction to enforce the judgments that have been entered in this case.

6. The clerk must close the file.

SO ORDERED on November 7, 2017.

                                            s/Robert L. Hinkle
                                            United States District Judge